## No. 12,219.

BOARD OF COUNTY COMMISSIONERS OF ROUTT COUNTY *v.*
DENVER AND SALT LAKE RAILROAD COMPANY.

(291 Pac. 1020)

Decided June 30, 1930. Rehearing denied September 29, 1930.

Mr. F. R. CARPENTER, Messrs. McCOMB & STRONG, for plaintiff in error.

Messrs. SMITH & BROCK, for defendant in error.

*En Banc.*

Mr. Justice Burke delivered the opinion of the court.

Plaintiff in error is hereinafter referred to as the county, and defendant in error as the company.

The county brought this action in March, 1926, to recover the sum of $14,567.25, being the first half of the road's 1918 tax, "with interest to date of allowance and payment of said indebtedness as by law provided. To review a judgment for principal only this writ is prosecuted.

From December 29, 1917, to March 1, 1920, the road was under federal control. Prior to that period, and from its close to January 1, 1927, it was in the hands of receivers. After the Government took charge of the road the receivers claimed it should pay this tax, and so notified the county. Up to 1920, at least, the Government denied that liability. As between the road and the United States the matter was never adjusted until their final settlement November 14, 1925. In that settlement the Government paid the road the principal only of the tax, taking a receipt which read "for the sole and exclusive purpose of settling the claims of State and County authorities of the State of Colorado * * * for taxes accruing * * * from January 1, to June 30, 1918." The county had no notice of this settlement and did not acquiesce in it in any way. For the first nine months of the Government's control one of the receivers was in charge as general manager for it. Herein the company denies *all* liability, but offers to pay the principal which it received from the United States. It claims that the county by failing to apply for an order compelling the receiver to pay, waived its rights to all but the principal, and by failing heretofore to litigate the question of liability is estopped to demand more. It appears that the receivership was closed by a sale of the road to the company, and the county prays that its judgment be established as a preferred claim against the proceeds. The cause was tried September 27, 1927. The company here

urges but two defenses to its liability for this claim: (1) The receivership; (2) federal control. Incident to these it says recovery of more than principal is inequitable, and that the sum demanded is due, if at all, from the United States.

■■ 1. Assuming that no question of federal control entered into this controversy, should judgment go for the county? This tax, with its statutory interest and other charges, is made a perpetual lien on the property "until the whole amount * * * is paid." Sections 7179 and 7375, C. L. 1921. That it was the duty of the receivers to pay the tax, and the duty of the court to order them to do so, is so well established as to require no discussion. Section 7255, C. L. 1921, imposes a special liability for failure, and section 7371, Id., obviates any necessity for personal demand. No act known to us limits the phrase "perpetual lien," or requires its foreclosure within a specified time on peril of its loss. A sale under a subsequent tax might extinguish it, or a presumption of payment might be raised, but this cause presents no such questions. The company says it could not attach to property in custodia legis. They reach this conclusion by drawing their analogy from bankruptcy proceedings and citing bankruptcy cases. The argument is fallacious. The National Bankruptcy Act supersedes all state statutes and all their liens give way before it. The same is not true of liens created by state statutes when they meet receiverships in state courts. Then they stand, unless the state law otherwise provides. Of course, in a receivership, such a lien may to some extent be superseded by certain judicial costs as a necessary incident to the exercise of the court's equity powers, but no such question here arises. If a court can lift a railroad out of the tax lists by the simple process of a receivership and divert the funds otherwise available to the public revenue into the pockets of private creditors, a new use for receiverships appears. But for federal control

we think it clear that the lien attaches and the claim of the county is valid.

2. Did federal control wipe out this tax debt, or any part of it, or prevent it accruing, or permanently substitute the United States as the tax debtor? Certainly not, unless some valid federal act specifically so provides. "Yes" and "no" these parties answer, and cite certain federal legislation in support of their contentions.

We need not notice the Act of August 29, 1916, authorizing the President to take control of the nation's transportation lines, nor his proclamation of December 26, 1917, doing so, nor the congressional ratification thereof of date March 21, 1918. The Federal Control Act is chapter 25, 40 Stat. L., p. 451. Section 1 thereof provides that "other taxes," which include those here in question, "shall be paid out of revenues derived from railway operations while under Federal control"; and that all taxes assessed for the period prior to January 1, 1918, "shall be paid by the carrier out of its own funds, or shall be charged against or deducted from the just compensation."

Section 10 reads in part: "That carriers while under Federal control shall be subject to all laws and liabilities as common carriers, whether arising under State or Federal laws or at common law, except in so far as may be inconsistent with the provisions of this Act or any other Act applicable to such Federal control or with any order of the President. Actions at law or suits in equity may be brought by and against such carriers and judgments rendered as now provided by law; and in any action at law or suit in equity against the carrier, no defense shall be made thereto upon the ground that the carrier is an instrumentality or agency of the Federal Government. * * * But no process, mesne or final, shall be levied against any property under such Federal control."

Section 12 reads in part: "That moneys or other property derived from the operation of the carriers during Federal control are hereby declared to be the property

of the United States. * * * If Federal control begins or ends during the tax year for which any taxes so chargeable to railway tax accruals are assessed, the taxes for such year shall be apportioned to the date of the beginning or ending of such Federal control, and disbursements shall be made only for that portion of such taxes as is due for the part of such tax year which falls within the period of Federal control."

Section 15 of the act reads in part: "That nothing in this Act shall be construed to amend, repeal, impair, or affect the existing laws or powers of the States in relation to taxation * * * except wherein such laws, powers, or regulations may affect the transportation of troops, war materials, Government supplies, or the issue of stocks and bonds."

The Transportation Act of 1920 is chapter 91, 41 Stat. L., p. 456. Section 206 (a) thereof, at page 461, reads in part: "Actions at law, suits in equity and proceedings in admirality, based on causes of action arising out of the possession, use, or operation by the President of the railroad or system of transportation of any carrier * * * of such character as prior to Federal control could have been brought against such carrier, may, after the termination of Federal control, be brought against an agent designated by the President for such purpose, * * *."

It will be observed that, with two exceptions, these acts contain no word limiting the authority of the state in the matter of taxation. Those exceptions are found in the quoted portions of sections 10 and 15 supra, and extend only to such action as might interfere with the use of the property by the United States for the purposes for which possesion was taken. Otherwise these acts confine themselves to a regulation of the respective rights of the carrier and the Government, with which subject the county had no concern. Finally, to put at rest all doubts concerning the matter, said section 15 expressly declares the intention of the United States to leave all state laws and regulations unimpaired in their operation so far as

they do not interfere with specified governmental uses. It is immaterial that, after the termination of federal control, the county had a right of action against a presidential agent for the collection of this tax. No statute made such action exclusive and no reason existed why it should be selected in preference to an enforcement of the county's lien.

Counsel for the company cite *Missouri Pacific R. Co. v. Ault,* 256 U. S. 554, 41 Sup. Ct. 593, 65 L. Ed. 1087, and quote therefrom, inter alia, on the federal control status: "The situation was analogous to that which would exist if there were a general receivership of each transportation system."

They then assert: "The provisions of the Federal Control Act and the Transportation Act, as construed by the Supreme Court of the United States, necessarily substitute the Federal Government as debtor in the place of the carrier under Federal control."

Accepting these propositions, modified as they must be by the specific language of section 15, supra, the conclusion is inevitable. In the hands of the debtor the state's lien for taxes would attach. Under a general receivership the same would be true unless the statute under which that receivership operated, or the law applicable to its administration, forbade. If so, then they "impair * * * existing laws * * * of the State in relation to taxation." That is the identical thing which said section 15 declares "Nothing in this Act shall be construed" to do.

■ The equities of this controversy seem to us simple, and with the county. For some months after this tax became a lien a receiver for the road was in charge, presumably as general manager for the United States, and there was a dispute between the carrier and the Government as to which was in control and liable. When that was settled, if it ever was, there was a dispute between them as to the amount of the tax, which dispute remained unsettled until the property was turned back.

This tax had then been delinquent but seven months. During all the period of federal control there was a dispute between them concerning a contract demanded by the Government and refused by the carrier. During this entire time the county was, in effect, invited to abandon its lien and chase these contending claimants through a doubtful course of litigation to see which, if either, it could hold. Preferring to refrain, and rest upon its statutory rights until a favorable opportunity for enforcing them appeared, it is now told that it has waived, and is estopped, and must take what the debtor sees fit to offer. We are unable to spell equity out of this proposition.

As a last reason for not paying, the company says that it does not appear that there are sufficient funds available from the sale of the property out of which the disputed sum can be discharged. This objection relates to the satisfaction of the judgment, hence requires no consideration here.

For the foregoing reasons the judgment is reversed and the cause remanded with directions to the trial court to enter judgment for the county in conformity with this opinion.

MR. CHIEF JUSTICE WHITFORD and MR. JUSTICE CAMPBELL not participating.

MR. JUSTICE ADAMS sitting as Chief Justice.